IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

VIRGINIA SLOCUM,

    Plaintiff,

vs.                                          CASE NO. 1:04CV14-MMP/AK

JO ANNE B. BARNHART,
**Commissioner of Social Security**

    Defendant.

_____/

## REPORT AND RECOMMENDATION

This action is brought pursuant to 42 U.S.C. § 405(g) of the Social Security Act (Act) for review of a final determination of the Commissioner of Social Security (Commissioner) denying Plaintiff's applications for disability insurance benefits (DIB) under Title II of the Act and supplemental security income benefits (SSI) filed under Title XVI of the Act.

Upon review of the record, the Court concludes that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

A.  **PROCEDURAL HISTORY**

Plaintiff filed an application for DIB and SSI on April 6, 1998, alleging a disability onset date of August 24, 1997, because of two herniated discs and a pinched nerve. Plaintiff petitioned for a hearing before an administrative law judge (ALJ), who conducted three hearings, two of which included only the ALJ, counsel for Plaintiff and a vocational expert.  The ALJ entered an unfavorable decision on May 29, 2002.  The Appeals Council denied Plaintiff's request for review, thus making the decision of the ALJ the final decision of the Commissioner.  This action followed.

B.  **FINDINGS OF THE ALJ**

The initial hearing held on November 19, 1999, was continued so that a consultative examination could be performed.  (R. 22).  The Plaintiff was not present at the second or third hearings held on February 14, 2001, and December 17, 2001, respectively, but was represented by Douglas Hinshaw.  (R. 22).  The ALJ found that Plaintiff has cervical syndrome with radiculopathy, which is severe within the meaning of the regulations, and that she suffers from early cataracts and mood disorder, which are not severe in that they do not limit her ability to perform basic work related activities.  (R. 24).  After carefully reviewing all the evidence, the ALJ found that Plaintiff was capable of sitting 7 to 8 hours out of an eight hour day; standing or walking 7 to 8 hours out of an 8 hour day; that she can lift 20 pounds occasionally, but cannot push or pull with more than minimal force; that she can grasp, handle, finger and manipulate without difficulty; can operate pedal controls constantly; can occasionally bend, stoop, and kneel, but

**No. 1:02CV125-SPM/AK**

cannot perform other postural activities or reach overhead; and has no environmental or mental limitations.  (R. 35).  The ALJ, utilizing the services of a vocational expert, found that Plaintiff's past relevant work was as an Administrative Clerk, and that she retained the Residual Functional Capacity to perform this work as it is generally performed.[1]  Thus, the ALJ found that Plaintiff was not disabled.

## C. ISSUES PRESENTED

Plaintiff argues that the ALJ did not include Plaintiff's clearly documented mental limitations in her hypothetical to the vocational expert; and the ALJ failed to give the proper weight to the State of Florida's findings that Plaintiff was disabled, which are based on the same evaluation process as the federal system.

The Commissioner responds that the ALJ relied upon the report of Dr. Benoit to support her finding that Plaintiff had no mental limitations and did not give great weight to the opinion of Dr. Amiel, who opined otherwise, because his report was based on Plaintiff's self reports and her husband's comments, which the ALJ found not entirely credible.  The Commissioner also responds that the regulations specifically provide that the findings of another agency are not binding on the ALJ, and in this case, the ALJ addressed the state agency's finding and rejected it because it was based on Plaintiff's

---

[1] Plaintiff had described her previous job as requiring decorating, which entailed overhead lifting and reaching.  A vocational expert considering these duties precluded her from performing her past relevant work, as she described it, but a second vocational expert testified that these duties were not typical and that no overhead reaching and lifting was required typically for administrative clerks.

**No. 1:02CV125-SPM/AK**

self reports and the report of Dr. Mandel, whom the ALJ found to have questionable findings.

The issue thus presented is whether the Commissioner's decision that Claimant is not disabled is supported by substantial evidence in the record and decided by proper legal standards.

D.     **STANDARD OF REVIEW**

Title 42 U.S.C. § 405(g) sets forth the standard of review for this court. The Commissioner's decision must be affirmed if it is supported by substantial evidence and the correct legal standards have been applied. Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997). Findings of fact by the Commissioner which are supported by substantial evidence are conclusive. 42 U.S.C. § 405(g). Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996). "Substantial evidence" has been defined to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citation omitted) (per curiam). It is more than a scintilla, but less than a preponderance. Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted). The court may not reweigh the evidence or substitute its judgment for that of the Commissioner. Wolfe v. Chater, 86 F.3d 1072, 1076 (11th Cir. 1996). It must determine only if substantial evidence supports the findings of the Commissioner. See Bridges v. Bowen, 815 F.2d 622, 624 (11th Cir. 1987) (per curiam). Even if substantial evidence exists which is contrary to the Commissioner's findings, where there is substantially supportive evidence of the

Commissioner's findings, the court cannot overturn them. Barron v. Sullivan, 924 F.2d 227, 230 (11th Cir. 1991). Unlike the deferential review accorded to the Commissioner's findings of fact, his conclusions of law are not presumed valid. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). The Commissioner's failure to apply correct legal standards or to provide the reviewing court with an adequate basis for it to determine whether proper legal principles have been observed requires reversal. Id. (citations omitted).

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(f), the Commissioner analyzes a claim in five steps:

1. Is the individual currently engaged in substantial gainful activity?
2. Does the individual have any severe impairment?
3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

**No. 1:02CV125-SPM/AK**

    4.    Does the individual have any impairments which prevent past relevant work?

    5.    Do the individual's impairments prevent any other work?

A finding of disability or no disability at any step renders further evaluation unnecessary. Plaintiff bears the burden of establishing a severe impairment that keeps him from performing his past work. If Plaintiff establishes that his impairment keeps him from his past work, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given Plaintiff's impairments, Plaintiff can perform. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986); MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, Plaintiff must prove that he cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987). It is within the district court's discretion to affirm, modify, or reverse a Commissioner's final decision with or without remand. 42 U.S.C. § 405(g); Myers v. Sullivan, 916 F.2d 659, 676 (11th Cir. 1990).

**E.**    <u>**SUMMARY OF CLAIMANT'S RELEVANT MEDICAL HISTORY**</u>

The medical evidence provides that Plaintiff suffered a neck injury in a car accident in 1997, for which she was diagnosed with acute cervical strain and neural foramina encroachment. (R. 218). She was given a soft collar to wear and pain medication. (R. 219). An x-ray showed spasm and degenerative disc at C5-C6. (R. 221). An EMG showed "irritation of the cervical nerve roots." (R. 225). She returned to work after 4 days. (R. 232). Two neurological examinations were conducted for

**No. 1:02CV125-SPM/AK**

continued pain following the accident, which resulted in a diagnosis of cervical radiculopathy by Dr. Rothman on August 11, 1997 (R. 240-41) and cervical, upper dorsal fasciomyositis by Dr. Kreitzer on September 8, 1997. (R. 242-244).

An Independent Orthopedic Evaluation was conducted on September 24, 1997, by Dr. Paul Jones, who found her to have two small disc herniations at C5-C6 and a "slowly resolving cervical syndrome." (R. 246). Suggested treatment was continued physical therapy. (R. 247). Plaintiff was working at the time of the examination. (R. 247).

Medical records from her treating physician, Dr. Nilo Herrera (R. 248-274) confirmed by MRI "diffuse disc bulging, dehydration and thinning at the C5/6 disc level." (R. 260). Although Herrera referred her for physical therapy, she discontinued treatment after 4 visits because her chiropractor told her not to exercise. (R. 275).

An independent medical examination conducted in conjunction with her lawsuit over her car accident found her to have reached maximum medical improvement as of January 26, 1998, and to be able to work part time. (R. 277-278).

Dr. Rottman, an neurologist who performed an independent medical examination, suggested that Plaintiff return to work on a trial basis and that any further treatment should include surgery. (R. 280-281).

A consult with Dr. Bennitt Patterson and Eric Scott in January 1998, suggested surgical intervention. (R. 304-306). Before surgery, they wanted a cervical myelogram, which was performed on September 10, 1998, (apparently Plaintiff had to return to New

**No. 1:02CV125-SPM/AK**

York for an extended period of time) and showed "disk osteophyte complex at C5/6 with mild effacement of the thecal sac from an osteophyte support. There is moderate bilateral forminal stenosis..much milder changes at C6/7...asymmetric filling of the C7 root to the left. This certainly shows much less significant findings than what her previous MRI had indicated." (R. 301). A nerve EMG was recommended. (R. 301).

Dr. George Feussner performed the EMG and found "mild degree of C6 root irritation." (R. 307-310).

Surgery was performed in October 1998 by Dr. John Stevenson, who reported some improvement, but was of the opinion that she would be unable to work for at least 12 months. (R. 319-324). She had a discectomy and fusion at C5-7 and C6-7. (R. 324, 404-406). In a letter dated December 8, 1998, he described Plaintiff's course of treatment, which culminated in the fusion surgery, and he gave her a good prognosis with a total impairment rating of 8%. (R. 417-418).

Another orthopedic evaluation by Dr. Josh Mandel related to her lawsuit in New York was performed in April 1999, and a moderate limitation in all motions of the cervical spine was noted. (R. 400). She had tenderness and spasm. An x-ray revealed a solid fusion of C5-6 and C6-7, but examination noted continued pain, despite the surgery, and a marked, permanent, pain producing disability was noted. (R. 402). "Her cervical prognosis clearly is very poor." (R. 402).

An EMG study in July 1999 was normal. (R. 352-361).

**No. 1:02CV125-SPM/AK**

Dr. Lipnick examined Plaintiff in November 1999, and prescribed physical therapy, exercise, and Prozac for her conditions. (R. 407-415). His nerve studies were abnormal and he found "chronic left C-7 radiculopathy with evidence of chronic axonal degeneration and reinnervation." (R. 411). His physical capacity evaluation limited her to standing, walking, or sitting 7 to 8 hours a day; lifting 10 to 20 pounds; limited grasping and fine manipulation; with limited crawling, bending, kneeling, squatting, and climbing and no overhead reaching. (R. 413-415).

Mental health records from Meridian show four or five visits for adjustment disorder and depression/anxiety regarding the disability process and money problems. (R. 325-331, 367-372). She also received a diagnoses of post traumatic stress disorder resulting from her car accident. Zoloft was prescribed for her depression. (R. 367-372).

A Medical Assessment of Ability to do Work-Related Activities (mental) completed by Dr. Lynn Edgar (from Meridian) found Plaintiff markedly limited in dealing with the public, extremely limited in dealing with work stress, concentration, carrying out complex or detailed job instructions, and "very depressed." (R. 384-386). Dr. Edgar found the cause of these limitations to be "trauma to neck/brain stem (?)."

A Psychiatric Review Technique Form completed by an administration psychological consultant, Dr. Jeffrey Benoit, who based his opinion on the evidence from Meridian, found no severe impairment, only a slight deficiency in concentration, persistence or pace resulting from her adjustment disorder and depression. (R. 339).

A psychological consultative examination was performed on February 4, 2000, by Bruce Jennings and Dr. Louis Legum.  (R. 419-423).  She scored high for malingering on the MMPI and appeared overinvested in her disability.  (R. 421-22).  The examiner noted no indication of pain three hours into the examination, but she exhibited some difficulty in standing after this time.  (R. 423).  A medical assessment completed by Dr. Legum found no limitations.  (R. 424-425).  Plaintiff reported to the ALJ that she felt belittled by the examiner regarding a comment Jennings made about her not being a genius.  (R. 441, 449).  Plaintiff's attorney also wrote that this report should be afforded very little weight because the examiner, Bruce Jennings, was not an acceptable medical source, and the medical doctor only signed off on the report, he did not conduct the examination.  (R. 442).

A psychiatric consultative examination was performed on March 3, 2000, by Dr. Michael Amiel.  (R. 426-435).  He had the mental evaluation of Dr. Legum and Plaintiff's medical records concerning her neck injury and course of treatment, except the notes of the actual surgery were missing.  (R. 431, 434).  It was Dr. Amiel's opinion that her physical symptoms were not out of proportion to her organic pathology and that she was partially compromised by her mental condition, which was not PTSD in his opinion, but was chronic in nature.  (R. 434).  He found her abilities to function in a work environment to be fair to poor.  (R. 436-437).

A Residual Functional Capacity Assessment completed in October 1998, based on treating physician records, found Plaintiff to be capable of lifting 10 to 20 pounds;

**No. 1:02CV125-SPM/AK**

standing, sitting or walking six hours a day; with unlimited pushing and pulling, but limited reaching.  (R. 311-318).

Another Residual Functional Capacity Assessment completed in July 1999, found Plaintiff to be capable of lifting 10 to 20 pounds; standing, sitting or walking six hours a day; with unlimited pushing and pulling, but limited reaching, climbing, stooping, kneeling, crawling, with no concentrated exposure to hazards.  (R. 341-348).

The Final Order of the Florida Department of Children and Families reversed the previous decision by the state agency and found that Plaintiff could not perform her past relevant work as an administrative assistant, suffered from acute cervical strain, severe, with traumatic lower cervical radiculopathies on the left, super-imposed on a mild to moderately degenerative lower cervical spine, severe depression, depressed mood, feelings of helplessness and hopelessness.  (R. 129).  She was awarded benefits from August 24, 1999.  (R. 125-131).

F.      **SUMMARY OF THE ADMINISTRATIVE HEARING (November 19, 1999)**

Plaintiff testified that she was 61 years old at the time of hearing and last worked as a "front desk person" at a country club.  (R. 47-48).  She worked there for 16 years.  (R. 48).  Plaintiff describes her disability as "chronic pain every day in the back of my neck, across both shoulders, down my left arm into my left hand and...pain in both legs."  (R. 49).  Plaintiff had surgery, an anterior diskectomy.  (R. 50).  She had a lawsuit pending in New York, relative to the car accident in which she hurt her neck, and has undergone a number of independent medical examinations (IME) in conjunction with

that suit. (R. 51). Plaintiff testified that she was told by these doctors not to lift any more than 8 ½ to 10 pounds, to try and walk ½ hour a day, and to continue physical therapy. (R. 52-53). She claims that she can sit or stand no longer than 15 minutes. (R. 53-54). None of the IME's were for mental problems, although she describes her "depression" as a result of extreme anger at the person who hit her and the circumstances of the accident. (R. 55-56). Plaintiff began seeing someone at Meridian, a licensed counselor, and received a prescription for Paxil and then Zoloft, although she never actually saw a psychiatrist. (R. 58-59). The hearing was continued to allow the attorney to obtain and submit additional medical evidence regarding her mental status and for a mental evaluation by the administration. (R. 61-63).

**G.    SUMMARY OF THE ADMINISTRATIVE HEARING (February 14, 2001)**

Present were the ALJ, counsel for the Plaintiff, and a vocational expert. The ALJ wanted clarification of something she read in the transcript about Plaintiff's past relevant work as a dancer. Her attorney stated that he would get information about this work from Plaintiff and submit it to the ALJ by letter. (R. 69-70). Additional information would be obtained from the expert via interrogatories. (R. 70).

**H.    SUMMARY OF THE ADMINISTRATIVE HEARING (December 17, 2001)**

Plaintiff did not attend this hearing either, but her attorney and another vocational expert were present with the ALJ. (R. 75-76). The vocational expert testified as to the usual requirements of an administrative clerk, which did not typically require overhead work and was a sedentary to light duty category. (R. 79, 87). This expert's testimony

**No. 1:02CV125-SPM/AK**

was in line with the opinion of the other expert, Dr. Spitznagel, who opined that unless Plaintiff had to get up on ladders to do the decorating she described overhead, she would be able to perform her past relevant work.  (R. 100).

I.      **DISCUSSION**

     a)      Hypothetical to Vocational Expert

At the fifth step of the evaluation process, the ALJ must determine whether a claimant, based on her residual functional capacity, age, education and work experience, can adjust to other work in the national economy.  20 C.F.R. § 404.1520(a)(4).  The ALJ may make this determination by reliance upon the Medical Vocational Guidelines or by utilizing the services of a vocational expert.  Phillips v. Barnhart, 357 F.3d 1232, 1239 (11th Cir. 2004).  The Eleventh Circuit has "recognized that the grids may be used in lieu of vocational testimony on specific jobs if none of claimant's nonexertional impairments are so severe as to prevent a full range of employment at the designated level."  Wolfe v. Chater, 86 F.3d at 1078, quoting Passopulos v. Sullivan, 976 F.2d 642, 648 (11th Cir. 1992).  When the ALJ uses a vocational expert, he elicits responses from the expert by posing hypothetical questions to him or her.  Phillips, 357 F.3d at 1240.  In order for the expert's testimony to constitute substantial evidence to support the ALJ's findings with regard to this point, the ALJ must pose a hypothetical which includes all of the claimant's impairments. Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999).  However, the ALJ is only required

to pose those limitations she finds severe in the hypothetical to the expert. Pendley v. Heckler, 767 F.2d 1561, 1563 (11th Cir. 1985).

A hearing was held on February 14, 2001, for the sole purpose of obtaining the testimony of a vocational expert and to determine whether Plaintiff's dancing should be considered past relevant work. (R. 67). Her attorney was present and promised to get a statement from her about dancing and a job description of her past relevant work as an administrative clerk which would be provided to the expert via interrogatories.[2] (R. 68-69). The statement provided indicated that Plaintiff last worked as a dancer in 1976, so it would not be considered as past relevant work. (R. 136).

A third hearing was held on December 17, 2001, to clarify the job description Plaintiff gave about her work as an administrative assistant, which was to be her only relevant work. (R. 75). Because Plaintiff had described her past relevant work as involving decorating, a vocational expert was called to clarify the duties of an administrative clerk in general, and he testified that no heavy or frequent lifting or overhead reaching was normally required, and he found this job to be in the sedentary to moderately light category of work. (R. 79-80). The attorney gave him a hypothetical which included a person age 62; with a high school education; suffering from a combination of physical and mental impairments; able to lift and carry up to 20 pounds occasionally and 10 pounds frequently; limited to sitting no more than 5 hours; standing

---

[2] The interrogatories propounded to the expert were returned and the expert indicated that she would not be able to perform her past relevant work as she described it because she would be required to use a ladder and overhead reaching to decorate, but otherwise there were numerous jobs which she could perform. (R. 211-214).

**No. 1:02CV125-SPM/AK**

or walking up to 3 hours; able to occasionally grasp, handle, manipulate and finger; occasionally bend, stoop and kneel; no climbing, overhead work; occasional contact with the public; limited to moderate stress, and the expert said with these limitations she could perform her past relevant work as it was generally performed, as well as a number of other jobs. (R. 95-100). The ALJ found no mental restrictions on the basis of the record as a whole, her statements, and "surely considering the MMPI."[3] (R. 100). The attorney suggested obtaining another MMPI, but the ALJ said he would have to pay for it. (R. 103-104).

Plaintiff takes issue with the ALJ's failure to include mental limitations in his hypothetical to the expert, particularly the limitations found by Dr. Amiel. (See R. 426-435). In assessing the medical evidence, the ALJ was required to state with particularity the weight she gave the different medical opinions and the reasons therefor. MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir.1986). The ALJ does not specifically state what weight she is giving Dr. Amiel's report.[4] (R. 34-35). The ALJ noted that the report was based on Plaintiff's self-reports, records from Meridian, and the comments of her husband, but she did not state that these were bases for rejecting the report. In fact, the ALJ does not specifically reject the report, rather she appears to adopt it. The ALJ refers to Dr. Amiel's findings that Plaintiff was "only partially

---

[3] The MMPI referred to was obtained during the examination by Jennings and Legum and showed a high score for malingering. (R. 419-23).

[4] Dr. Amiel found Plaintiff to be limited to a fair to poor ability to work with the public, deal with stress, maintain concentration, and to understand or carry out complex or detailed work instructions, or behave appropriately in a work environment.

**No. 1:02CV125-SPM/AK**

compromised" by her mental condition and "[h]is assessment of her capacity ranged from limited but satisfactory to seriously limited [but] not precluded." [5] (R. 35).

The ALJ also did not specify the degree of weight she was according the report of Bruce Jennings and Dr. Louis Legum, although she discussed it in great length. (R. 33-34).

The ALJ expressly gave "great weight" to the assessment of Dr. Benoit, who reviewed the record as a whole, but did not actually examine Plaintiff. (R. 32). Dr. Benoit found her to have no mental limitations. (R. 339). The opinions of nonexamining, reviewing physicians, such as that of Dr. Benoit, when contrary to those of the examining physicians, are entitled to little weight, and standing alone do not constitute substantial evidence. See Spencer ex rel. Spencer v. Heckler, 765 F.2d 1090, 1094 (11th Cir.1985) (per curiam). However, the ALJ stated that Benoit's findings were entitled to great weight because they were consistent with the Meridian records and Meridian is Plaintiff's treating medical source for her mental condition. (R. 32). Since both Jennings/Legum and Amiel were one time consultative examinations, it is the opinion of the undersigned that it was harmless error not to state the degree of weight she was affording either of these reports since she made it clear that her decision not to assess Plaintiff any mental limitations was based on Plaintiff's treating medical source records, which should be afforded greater weight than one time examiners, and a non-examining physician, who reviewed those records, and made a functional assessment

---

[5] The ALJ apparently took this wording from the definitions of "fair" and "poor" provided in the Medical Assessment form used by Dr. Amiel. (See R. 436).

**No. 1:02CV125-SPM/AK**

that she had no severe mental limitations.  This Court is limited on review to determining whether the ALJ's decision is based on substantial evidence, and it finds that her decision not to assess mental limitations based on these records and pose them in the form of a hypothetical to the vocational expert was supported by substantial evidence.  Therefore, there is no merit to this ground.

      b)      <u>Findings of the Florida State Agency</u>

Plaintiff also argues that the ALJ failed to give "great weight" to the decision of the Florida Department of Children and Families, which uses the same 5-step evaluation process as Social Security.  The Department found Plaintiff disabled.  (R. 127).  Plaintiff contends that the Eleventh Circuit mandates that the ALJ give such decisions great weight.  <u>See</u> <u>Falcon v. Heckler</u>, 732 F.2d 827, 831 (11th Cir. 1984).  The ALJ here declined to give the opinion of the state agency any weight on the grounds that the opinion was based mostly on the Plaintiff's complaints of pain, and the opinion of Dr. Mandel, whose report the ALJ found questionable.  (R. 31).  The ALJ found Dr. Mandel's report to be in conflict with her surgeon's findings, Dr. Stevenson, who gave her a good prognosis and to whom she reported a relief from pain.  The ALJ also discredited Dr. Mandel's report because he did not assess her specific functional limitations, and "apparently used disability as a term synonymous with condition or impairment."  (R. 30).

A review of the Final Order by the state agency shows that it relied primarily upon the reports of Dr. Mandel for her physical condition and Dr. Amiel for her mental

**No. 1:02CV125-SPM/AK**

condition.  (R. 127).  There is no specific mention of any other medical sources that were considered nor was there any reference to a functional capacity assessment performed by a physician.  Although the Eleventh Circuit has held that other agency findings of disability should be afforded great weight, it expressly recognizes that such decisions are not binding on SSA.  See Falcon at 831; Bloodworth v. Heckler, 703 F.2d 1233, 1241 (11th Cir. 1983).  In this case, the ALJ properly considered the findings of the state agency, but stated with specificity why she would not adopt those findings.  There is no merit to this ground.

Accordingly, it is respectfully **RECOMMENDED**:

That the decision of the Commissioner denying benefits be **AFFIRMED.**    At Gainesville, Florida, this   **14th** day of June, 2005.

s/ A. KORNBLUM
ALLAN KORNBLUM
**UNITED STATES MAGISTRATE JUDGE**

**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**

**No. 1:02CV125-SPM/AK**